**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| CLINTON BROWN, MEGAN FRAGOLA, JOSHUA SAUBERMAN, and REBEKKA LIEN, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*<br><br>v.<br><br>AIRLINE TARIFF PUBLISHING COMPANY d/b/a ATPCO; 3VICTORS, INC.; AMERICAN AIRLINES, INC.; DELTA AIR LINES, INC.; SOUTHWEST AIRLINES CO.; ALASKA AIRLINES, INC.; JETBLUE AIRWAYS CORPORATION; and DOES 1–20,<br><br>*Defendants* | **Civil Action No.:**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

# TABLE OF CONTENTS


INTRODUCTION .......... 1

PARTIES AND UNNAMED CO-CONSPIRATORS .......... 5

JURISDICTION AND VENUE .......... 8

FACTUAL BACKGROUND .......... 9

A. The Domestic Air Travel Industry .......... 9

B. ATPCO Is the Airlines' Own Pricing-Data Exchange .......... 10

C. The Department of Justice Previously Alleged That Airlines Used ATPCO to Coordinate Fares .......... 11

D. The Evolution of ATPCO's Business—From Fare Filing to Pooled Shopping Data .......... 12

E. Iris Pools the Airlines' Shopping Data .......... 15

F. PriceEye Turns the Pooled Data Into Common Pricing Signals .......... 16

G. DemandView Gives Every Subscriber the Same Forward-Looking Demand Signal .......... 17

DEFENDANTS' ANTICOMPETITIVE SCHEME .......... 18

A. The Board Airlines Built the Exchange, and ATPCO Invited Other Airlines to Join .......... 19

B. Why Airlines Accept ATPCO's Invitation .......... 21

C. Each Airline Defendant's Participation .......... 22

i. JetBlue .......... 22

ii. Alaska and Hawaiian .......... 22

iii. American .......... 23

iv. Delta .......... 23

v. Southwest .......... 24

vi. Each Airline Defendant Knows Its Rivals Are Participating .......... 25

D. The ATPCO Cartel's Scheme Pays Off .......... 26

DIRECT AND INDIRECT EVIDENCE OF THE ATPCO CARTEL .......... 27

A. Direct Evidence of the ATPCO Cartel .......... 27

i. The Terms on Which Airlines Join .......... 27

ii. Statements by ATPCO and 3Victors .......... 27

iii. Communications Between the Hub and the Spokes .......... 28

B. Indirect Evidence of the ATPCO Cartel .......... 29

i. The Airline Defendants Act Against Their Individual Economic Interest .......... 29

ii. Parallel Conduct .......... 30
iii. The Market for Domestic Air Travel Is Susceptible to Cartelization .......... 31
THE RELEVANT MARKET .......... 32
DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET .......... 32
ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY .......... 33
CLASS ACTION ALLEGATIONS .......... 34
CAUSES OF ACTION .......... 36
COUNT ONE .......... 36
COUNT TWO .......... 38
PETITION FOR RELIEF .......... 39
JURY DEMAND .......... 40

Plaintiffs Clinton Brown, Megan Fragola, Joshua Sauberman, and Rebekka Lien (together, "Plaintiffs") bring this action on behalf of a proposed class of individual travelers and entities who buy tickets for domestic air travel in the United States. Plaintiffs seek relief from Defendant Airline Tariff Publishing Company d/b/a ATPCO ("ATPCO") and its subsidiary 3Victors, Inc. ("3Victors") (together, the "ATPCO Defendants"), as well as five of the nation's largest airlines—American Airlines, Inc. ("American"), Delta Air Lines, Inc. ("Delta"), Southwest Airlines Co. ("Southwest"), Alaska Airlines, Inc. ("Alaska"), and JetBlue Airways Corporation ("JetBlue") (collectively, the "Airline Defendants" and, with the ATPCO Defendants, "Defendants")—who conspired to raise and stabilize the price of domestic air travel in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## INTRODUCTION

1. Airlines collect valuable information every time travelers search for flights: where they want to go, when they want to go, and how they respond to offered fares. Drawn from millions of customer interactions, this proprietary information reveals demand and helps each airline set its prices. In a competitive market, airlines would guard that information from rivals and use it to compete for passengers. But the Airline Defendants, five of the six largest U.S. carriers, have agreed to pool their proprietary customer-demand information through a data hub owned by airlines and directed by a board of airline pricing executives. This arrangement gives competing airlines access to information they would otherwise have to obtain independently, replacing uncertainty about rivals' demand with shared intelligence used to coordinate fares.

2. The hub at the center of this arrangement is Defendant ATPCO, the airline-owned data company that describes itself on its website as "the single source of truth for pricing data." For decades, after the Department of Justice ("DOJ") sued it for allegedly helping airlines to coordinate their fares, ATPCO served as a clearinghouse for airlines' published fares pursuant to

a consent decree. ATPCO expanded its role in 2023 by acquiring 3Victors, a data analytics company that collects and analyzes "flight shopping data" – information about the flights for which travelers search and the offers they receive, whether or not they ultimately book a ticket.[1] The acquisition advanced ATPCO's initiative to pool and share airlines' proprietary shopping and demand data.

3. On information and belief, each Airline Defendant supplies 3Victors with its confidential flight shopping data, revealing the itineraries for which travelers are searching and the fares the airline offers in response. This information exposes emerging demand before it appears in bookings and shows how each airline prices flights to capture that demand. 3Victors then pools the data and provides participating airlines with a real-time view of competitors' fares and changes in traveler demand. The Airline Defendants then use this shared intelligence to set their own fares, continually informed by customer demand and pricing information supplied by their rivals.

4. Through this reciprocal exchange, the Airline Defendants have agreed to operate as a cartel, using ATPCO and 3Victors to coordinate pricing among otherwise competing carriers. The information they share is current, granular, and forward-looking: it reveals emerging demand and competitors' pricing responses while those insights can still influence fares. By pooling this competitively sensitive information and using it to set prices, the Airline Defendants reduce the uncertainty that would otherwise force them to compete for passengers. Their agreement substitutes coordinated pricing for independent competition, in violation of Section 1 of the Sherman Act.

---

[1] As 3Victors explains, flight shopping data "is the search request, and the offers returned in response, every time a traveler searches for a flight." Justin Jander, *How 3Victors Helps Airlines Understand Competitive Offers and Demand*, 3VICTORS.COM, https://www.3victors.com/blog/how-3victors-helps-airlines-understand-competitive-offers-and-demand?utm_source=chatgpt.com (last visited Nov. 2, 2026).

5. This case does not challenge airlines watching each other's published fares. Airlines have long been able to see filed fares through ATPCO. Reacting to a rival's public fare is not, by itself, what this case is about. What is alleged here is different. The Airline Defendants contribute non-public data drawn from their own systems, namely the flights travelers are searching for and the offers each airline returns, to a common pool. They condition each airline's access to its rivals' data on the airline's agreement to contribute its own data to the pool. They then receive back from the hub pricing and demand signals built from that pool.

6. This arrangement harms passengers like the Plaintiffs by weakening airlines' incentives to offer lower fares. When airlines must assess demand independently, cutting prices can help them attract passengers who might otherwise choose a rival. Shared demand information reduces that uncertainty, allowing each airline to anticipate when competitors can sustain higher fares and encouraging carriers to adopt similar pricing strategies. Real-time monitoring reinforces that coordination. Airlines can quickly detect and match a rival's discounts, reducing the rival's opportunity to gain business by lowering prices. Together, these mechanisms discourage discounting and sustain fares above competitive levels, keeping fares high.

7. ATPCO is no stranger to allegations of illegal airline price coordination. In 1992, the DOJ sued ATPCO and eight airlines alleging that they used its fare-distribution system to reach agreements to increase fares. The resulting consent decrees appear to have restricted those practices until their expiration in 2003 and 2004. In the years that followed, ATPCO expanded beyond distributing published fares to pooling proprietary shopping and demand information. The arrangement challenged here uses that expanded capability to coordinate pricing through a continuous exchange of competitively sensitive data.

8. In July 2023, ATPCO announced a shared data "clean room" hosted on Amazon Web Services where "collaborating airlines" could combine their data to "analyze their collective shopping insights." ATPCO expressly linked that collaboration to pricing, stating that the shared data would help airlines "create fares and offers" and "accelerate change in the airline pricing landscape." Its CEO confirmed that "multiple airlines already provid[ed] their shopping data, including dynamically generated pricing."

9. Five months later, in December 2023, ATPCO acquired 3Victors, whose products turn shopping data into tools for monitoring competitors' prices and anticipating demand.[2] PriceEye promises subscribing airlines "the most complete view of competitor pricing." It identifies sudden shifts, outliers, and undercuts, flags pricing "anomalies," where an airline's offers differ from its rivals', and ranks those differences by revenue impact. DemandView, launched on October 5, 2026, mines "more than 1.4 billion daily search records" to reveal where "demand is building, before it appears in bookings." Together, these products give airlines tools to track rivals' pricing and identify emerging demand.

10. The ATPCO Defendants' platforms translate shared information into guidance for airlines' pricing teams. 3Victors identifies markets where an airline's offer differs from its rivals', ranks those differences by the revenue at stake, and directs pricing teams' attention to them. According to ATPCO's Chief Commercial Officer, a pricing team is "pointed directly to what's changed and what it means in minutes, not in days." 3Victors also developed features intended to help pricing teams understand "which lever should be pulled." These tools enable airlines to identify and respond rapidly to pricing differences across competitors.

---

[2] *Airline Data Powerhouse ATPCO Buys Data Intelligence Platform 3Victors*, ATPCO (press release) (Dec. 12, 2023), https://www.3victors.com/post/airline-data-powerhouse-atpco-buys-data-intelligence-platform-3victors (last visited Nov. 2, 2026).

11. Defendants' coordination scheme has raised airline prices. An analysis of data from the Bureau of Transportation Statistics' Airline Origin and Destination Survey shows that the passenger-weighted average one-way fare across 693 U.S. routes rose 30.7% from $198.71 in the first quarter of 2022 to $259.66 in the first quarter of 2026, an average increase of 6.9% per year on a compound basis.

12. In 1897, the Supreme Court held that competing railroads violated the Sherman Act by agreeing to establish and maintain freight rates.[3] The technology has changed since then, but the governing principle remains the same: competitors may not agree to suppress price competition. A price-fixing agreement does not become lawful because it is carried out through shared data and pricing algorithms. Plaintiffs bring this action on behalf of all individuals and entities that purchased tickets for domestic air travel from the Airline Defendants during the Class Period, seeking treble damages for the resulting overcharges, and an injunction prohibiting Defendants' unlawful coordination and exchange of competitively sensitive information.

## <u>PARTIES AND UNNAMED CO-CONSPIRATORS</u>

13. Plaintiff Clinton Brown ("Plaintiff Brown") is a citizen and resident of Isleton, California. During the Class Period, Plaintiff Brown purchased tickets for domestic air travel from Alaska Airlines, Delta Air Lines, JetBlue Airways, Southwest Airlines, and American Airlines. Plaintiff Brown paid more for those tickets than Plaintiff Brown would have paid absent Defendants' unlawful conduct and was injured in Plaintiff Brown's business or property as a result.

14. Plaintiff Megan Fragola ("Plaintiff Fragola") is a citizen and resident of New York, New York. During the Class Period, Plaintiff Fragola purchased tickets for domestic air travel from Alaska Airlines, American Airlines, Delta Air Lines, JetBlue Airways, Southwest Airlines,

[3] *United States v. Trans-Missouri Freight Ass'n,* 166 U.S. 290, 328–43 (1897).

and United Airlines. Plaintiff Fragola paid more for those tickets than Plaintiff Fragola would have paid absent Defendants' unlawful conduct and was injured in Plaintiff Fragola's business or property as a result.

15. Plaintiff Joshua Sauberman ("Plaintiff Sauberman") is a citizen and resident of Syosset, New York. During the Class Period, Plaintiff Sauberman purchased tickets for domestic air travel from Alaska Airlines, United Airlines, Southwest Airlines, and American Airlines. Plaintiff Sauberman paid more for those tickets than Plaintiff Sauberman would have paid absent Defendants' unlawful conduct and was injured in Plaintiff Sauberman's business or property as a result.

16. Plaintiff Rebekka Lien ("Plaintiff Lien") is a citizen and resident of Los Angeles, California. During the Class Period, Plaintiff Lien purchased tickets for domestic air travel from Delta Air Lines, Southwest Airlines, and American Airlines. Plaintiff Lien paid more for those tickets than Plaintiff Lien would have paid absent Defendants' unlawful conduct and was injured in Plaintiff Lien's business or property as a result.

17. Defendant Airline Tariff Publishing Company, which does business as ATPCO, is headquartered at 2340 Dulles Corner Boulevard, Suite 800, Herndon, Virginia 20171. On information and belief, ATPCO is a District of Columbia corporation registered to do business as a stock corporation in Virginia. In 2016, ATPCO identified United, Delta, and American as its corporate parents in a federal court filing, and ATPCO's website today displays the logos of American, Delta, and United, among other airlines, as members of its board of directors.

18. Defendant 3Victors, Inc. is a Delaware corporation headquartered in Plano, Texas, that ATPCO acquired in late 2023.

19. Defendant American Airlines, Inc. is a Delaware corporation headquartered in Fort Worth, Texas, and a subsidiary of American Airlines Group Inc. American is one of the four largest U.S. airlines by domestic traffic. American's participation in the ATPCO Cartel is alleged below.

20. Defendant Delta Air Lines, Inc. is a Delaware corporation headquartered in Atlanta, Georgia. Delta is one of the four largest U.S. airlines by domestic traffic. Delta's participation in the ATPCO Cartel is alleged below.

21. Defendant Southwest Airlines Co. is a Texas corporation headquartered in Dallas, Texas. Southwest is one of the four largest U.S. airlines by domestic traffic. Southwest's participation in the ATPCO Cartel is alleged below.

22. Defendant Alaska Airlines, Inc. is an Alaska corporation and a subsidiary of Alaska Air Group, Inc., which is headquartered in Seattle, Washington. On September 18, 2024, Alaska Air Group acquired Hawaiian Holdings, Inc., the parent of Hawaiian Airlines, Inc., and in October 2025 Alaska and Hawaiian received a single operating certificate from the Federal Aviation Administration, which recognizes them as one airline under Alaska's certificate. References to Alaska include Hawaiian Airlines from September 18, 2024 forward. Alaska's participation in the ATPCO Cartel is alleged below.

23. Defendant JetBlue Airways Corporation is a Delaware corporation headquartered in Long Island City, New York. JetBlue's participation in the ATPCO Cartel is alleged below.

24. Does 1 through 20 are other airlines, data providers, and persons who participated in the conspiracy alleged herein and whose identities Plaintiffs do not yet know, including carriers that contribute shopping data or receive PriceEye or DemandView outputs. ATPCO's other board

airlines, including United Airlines,[4] Air Canada, Air France, All Nippon Airways, British Airways, Hawaiian Airlines (before its acquisition by Alaska Air Group), KLM, LATAM, and Lufthansa, and the "major global network carrier" that "went live with PriceEye and Iris" in 2025, may be co-conspirators. Plaintiffs will amend this Complaint when their identities and roles are known. Each Defendant is liable for the acts of its co-conspirators taken in furtherance of the conspiracy.

25. Each Defendant acted through its officers, directors, employees, and agents, who acted within the scope of their authority.

## JURISDICTION AND VENUE

26. Plaintiffs' claims arise under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court therefore has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

27. This Court has personal jurisdiction over each Defendant under Section 12 of the Clayton Act, 15 U.S.C. § 22, which authorizes nationwide service of process on corporate defendants, and because each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the conspiracy throughout the United States, including in this District. ATPCO is headquartered in this District, 3Victors issues its releases from Dulles, Virginia, and, on information and belief, the exchange alleged here is administered from this District.

---

[4] United Airlines' Contract of Carriage purports to require passengers to submit notice describing any dispute arising out of or relating to transportation covered by the contract and allow 60 days for a response and attempted resolution before commencing suit. The provision characterizes compliance as a condition precedent to recovery. Although Plaintiffs do not agree that the pre-notice requirement is valid, out of an abundance of caution, Plaintiffs intend to notify United of this dispute and have not named them as a defendant in this action.

28. Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d), because ATPCO resides and is found in this District and, on information and belief, so does 3Victors; each Defendant transacts business in this District; a substantial part of the events giving rise to Plaintiffs' claims, including the operation of the exchange, occurred here; and a substantial portion of the affected interstate trade and commerce was carried out in this District. Each Airline Defendant sells tickets to residents of this District and operates scheduled flights at Ronald Reagan Washington National Airport, which is in this District.

29. Venue is proper in the Alexandria Division because ATPCO maintains its headquarters in Herndon, in Fairfax County, Virginia; 3Victors issues its releases from Dulles, Virginia; each Airline Defendant operates at Reagan National Airport in Arlington County; and a substantial part of the events giving rise to Plaintiffs' claims occurred here.

30. Defendants' conduct was within the flow of, was intended to, and did have a substantial effect on the interstate commerce of the United States, including the market for domestic scheduled passenger air transportation.

## FACTUAL BACKGROUND

### A. The Domestic Air Travel Industry

31. The domestic air travel market is highly concentrated. In 2023, the DOJ alleged that American, Delta, United, and Southwest together "control approximately 80% of flights nationwide." According to the Bureau of Transportation Statistics, in the twelve months ending July 2026, Delta accounted for 17.9% of the U.S. domestic revenue passenger miles, American 17.7 percent, United 17.2 percent, Southwest 17.1 percent, Alaska 7.1 percent, and JetBlue 4.6 percent. Many individual routes are served by only two or three of them. The market dominance of the six largest U.S. airlines is more prominent on a route-by-route basis. One of the six largest

airlines was the largest airline on routes carrying 96% of passengers, and the largest airline had an average 51% share on those routes.

32. The DOJ described Spirit Airlines, an ultra-low-cost carrier, as "less vulnerable to discipline through ATPCO." Spirit has since left the market, filing for bankruptcy in November 2024 and again in August 2025, and on May 2, 2026, it canceled all flights and began an orderly wind-down of its operations.

**B. ATPCO Is the Airlines' Own Pricing-Data Exchange**

33. Airlines do not set fares in isolation. They file them, with their rules and conditions, through ATPCO. ATPCO explains: "We collect our flagship pricing data direct from airlines and distribute it to you in the format you want." ATPCO subscribers can receive that data "as often as every hour." As ATPCO puts it: "There's only one place to get the world's most comprehensive and accurate airline pricing data: ATPCO."

34. ATPCO's fare-management tool lets an airline "[a]ccess a large global database that includes public, private, and interline fare data from over 440 airlines." ATPCO serves "457 airlines and 118 channels across 148 countries," and its database supports 23.6 million fare changes daily. At its April 2026 conference, ATPCO's chief executive reported "over 20 million fare changes every day," and "up to 80 million fare changes every day" during the preceding two months. ATPCO's chief executive describes its role this way: "one of the roles that ATPCO has played for decades is as the industry's neutral data exchange. It's how we've supported pricing, acting as a single shared connection point across the ecosystem."

35. ATPCO is not a neutral outsider. It is "[o]wned by airlines," including Airline Defendants American and Delta, as well as United and other carriers. ATPCO's 2023 board consisted of eleven airline executives, most of them pricing or revenue-management executives at their carriers, including Scott Chandler, Vice President of Revenue Management at American;

Roberto Ioriatti, Senior Vice President of International Pricing and Revenue Management at Delta; Dave Bartels, Vice President of Pricing and Revenue Management at United; and Brent Overbeek, Senior Vice President and Chief Revenue Officer of Hawaiian Airlines, who served on ATPCO's board from 2014 to 2024. The executives responsible for setting fares at competing airlines thus meet as ATPCO's board to direct the company that collects and distributes their pricing data.

### C. The Department of Justice Previously Alleged That Airlines Used ATPCO to Coordinate Fares

36. On December 21, 1992, the United States sued ATPCO and eight airlines: Alaska, American, Continental, Delta, Northwest, Trans World, United, and USAir.[5] The complaint alleged that "[e]ach of the airline defendants is an owner of [ATPCO], and [ATPCO] maintains on their behalf a data base of airline fare information."

37. The DOJ complaint alleged that ATPCO's reports "allow the airline defendants to monitor and analyze immediately each other's fare changes," and that the airlines used ATPCO to "exchange[] proposals to change fares and negotiate[] increases to fares," to "trade[] fare increases" in some city-pair markets for fare increases in others, and to "agree[] to increase fares . . . by exchanging mutual assurances," using devices such as first and last ticket dates, fare codes, and footnote designators.

38. The case ended in two final judgments. The judgment against United and USAir was entered on November 1, 1993, and provided that it "shall expire ten years from the date of its entry." The judgment against ATPCO and the remaining airlines was entered on August 10, 1994, and carried the same ten-year term, expiring in 2004. The judgments barred the airlines from

[5] Complaint ¶ 29, *United States v. Airline Tariff Publ'g Co.*, No. 92-2854 (D.D.C. Dec. 21, 1992), https://www.justice.gov/atr/case-document/file/483631/dl ("1992 DOJ Complaint").

disseminating certain fare information through ATPCO and from agreeing on fares, and the 1994 judgment bound ATPCO itself.

### D. The Evolution of ATPCO's Business—From Fare Filing to Pooled Shopping Data

39. ATPCO's business expanded from collecting and distributing airlines' filed fares and rules to collecting and distributing the data and tools airlines use to inform their pricing decisions. Through acquisitions and new data-sharing initiatives, ATPCO has supplemented its traditional fare database with information about consumer shopping activity, which allows participating airlines to use shared information to dynamically generate ticket prices.

40. Traditionally, ATPCO's business involved publishing the fares and pricing rules airlines submitted for distribution to travel agencies, reservation systems, and other sales channels. By 2018, ATPCO reported that it worked with more than 430 airlines and that its fare and pricing-rule content supported an estimated 87% of worldwide ticket sales.

41. In February 2018, ATPCO acquired Routehappy, a provider of information and details about seats, amenities, ticket benefits and restrictions, together with photographs and other marketing content.

42. ATPCO next acquired SITA's Airfare Insight system in January 2021. ATPCO announced that it planned to integrate the SITA system's capabilities into ATPCO's existing Architect pricing tool. ATPCO described Architect as automating the fare-management processes, reducing the complexity of integrating multiple systems, standardizing the display of web fares, and accelerating distribution to the marketplace. By acquiring SITA's system, ATPCO expanded its role from distributing filed fares to offering airlines tools to manage and implement pricing decisions.

43. In July 2023, ATPCO announced a further expansion: the use of Amazon Web Services' Clean Room technology to allow airlines to pool and collectively analyze the shopping data they each collected independently.

44. Shopping data is the digital footprint generated each time a traveler searches for a flight, fare, or schedule online. Unlike "booking data," which reflects actual ticket purchases, shopping data captures the intent, options explored, and behavior of consumers before they make an airline ticket purchase. It includes:

- Search Parameters: Origin and destination cities, travel dates, passenger counts, and whether the trip is one-way or round-trip.
- Offered Fares and Bundles: The exact prices, cabin classes, and ancillary options (like baggage and seat selection) displayed to the user at that specific moment.
- Response Timestamps: Exactly when the search occurred, which is critical for tracking real-time demand shifts.
- Carrier and Route Availability: Which airlines appeared in the search results and the specific connections or direct routes offered.

45. Shopping data, unlike the published fares that ATPCO historically provided, is the lifeblood of predictive analytics and dynamic pricing. By analyzing the massive volume of daily search queries, airlines and platforms can track live market demand, see exactly what competitors are offering in real time, and train machine learning models to build optimized, personalized flight bundles.

46. ATPCO stated that its initiative had the support of eleven board airlines and would combine approved airline data with ATPCO's fare and fare-related data to generate dynamic pricing offers. ATPCO's CEO confirmed that multiple airlines were already sharing their shopping data with ATPCO and other member airlines. The stated purpose of the initiative was to "generate rich pricing insights" from combined, collective airline datasets.

47. In December 2023, ATPCO announced its acquisition of 3Victors, a travel-data analytics company, further expanding its access to shopping data and its capacity to analyze that information. The announcement expressly connected the transaction to the industry's movement from traditional static fare filing toward dynamic offer creation. ATPCO explained that 3Victors' platform would supply "real-time" information about travel demand and supplement ATPCO's existing data with fares that were not filed through ATPCO. The announcement also linked the acquisition to its previously announced initiative for analyzing airlines' collective shopping insights.

48. Flight shopping data consists of the search request and the offers returned when a traveler searches for a flight. It therefore captures information about what travelers are seeking and the prices and products presented in response. Through its PriceEye product, 3Victors supplies competitive intelligence comparing airline offers across markets and distribution channels, enriched with information such as fare basis codes, branded fares, taxes and surcharges. The company's DemandView product supplies aggregated flight search information intended to reveal changes in traveler interest, including interest that has not yet resulted in a booking.

49. 3Victors expressly ties access to this pooled information to airlines contributing their proprietary data to 3Victors. Its description of Iris tells airlines: "the more you contribute, the more you receive." Thus, PriceEye customers that supply shopping data receive access to enriched competitive data. By participating, airlines are able to monitor competing offers and adjust their pricing strategies as market conditions change throughout the day. This contribution-based arrangement creates an incentive for participating customers to supply data to a common repository in exchange for broader competitive intelligence.

50. ATPCO's expansion reaches both the distribution of airline prices and the information used to formulate them. Unlike its traditional fare-filing business that distributes prices and rules airlines have established, its expanded shopping data business supplies information about competing offers and consumer demand that airlines can use in pricing decisions.

51. ATPCO is not a passive owner of 3Victors. ATPCO's own data is an input to 3Victors' products: PriceEye combines flight shopping data from multiple sources and enriches it with ATPCO data, including the fare basis codes and branded fares that originate in ATPCO's fare database. ATPCO's Chief Commercial Officer, whose remit includes 3Victors, presents and promotes 3Victors' products at ATPCO's own conference. ATPCO staff appear on panels with 3Victors staff and airline pricing personnel. And ATPCO's chief executive has described the 3Victors acquisition as the way ATPCO will "provide the inputs that an airline needs to enable dynamic retailing."

**E. Iris Pools the Airlines' Shopping Data**

52. 3Victors' products are built on Iris, which 3Victors calls "our industry shopping data repository" and "a shared shopping data repository," which it says "enables airlines to contribute and receive shopping data directly." 3Victors explains that Iris "combines proprietary, partner, and participant-based data into a single standardized stream of flight shopping data," from sources including shopping data "sourced directly from airline systems," from "direct airline APIs" – which are direct electronic connections to airlines' systems where flight shopping information is stored – and "[c]ontinuous shopping data from carrier platforms and partners" through "[s]treaming data feeds."

53. The data that airlines contribute from their own systems is not public. On information and belief, it is drawn from inside each airline's own systems and reflects what the airline is offering, on which routes, in which channels, and how consumers are searching, at a

speed and level of detail that no airline could assemble about its rivals on its own. 3Victors markets its products as superior to providers who rely on "scraping" public data from the internet.

**F. PriceEye Turns the Pooled Data Into Common Pricing Signals**

54. 3Victors' PriceEye tool "standardizes and enriches flight shopping data," adding fare basis codes, branded fares, and taxes and surcharges, and combining flight shopping data from multiple sources and enriching it with ATPCO data. According to 3Victors, "PriceEye helps airlines uncover pricing anomalies, monitor competitive movements, and analyze both historical pricing trends and future market positioning." It gives each subscribing airline "the most complete view of competitor pricing."

55. PriceEye does more than report data. Its dashboard lets an airline "[t]rack pricing changes over time to uncover historical undercuts" and "[v]iew future pricing and availability to identify competitive gaps, optimize positioning, and act before competitors do." "Our AI surfaces sudden shifts, outliers, and undercuts—with alerts that help you move quickly when markets change."

56. An "anomaly" is a market where an airline's offers differ from the rest of the market. As 3Victors explains: "if a competitor's offer on a route is USD 100 lower, PriceEye brings that to the airline's attention." PriceEye gives each anomaly an "impact score" that "considers factors such as the size of the price difference and how often the airline operates in that market." "PriceEye's Anomaly Detection identifies pricing anomalies and prioritizes them based on revenue impact." PriceEye's "Price Outlook provides a view of observed fares for future departure dates." And 3Victors is developing a feature, "Anomaly Drivers," whose stated "goal is to help teams move from just seeing that something changed to understanding what caused it, which lever should be pulled, and who needs to engage."

57. In a market where the major competitors subscribe, a tool that identifies, scores, and prioritizes each instance in which one airline's fare departs from its rivals' functions as a common mechanism for detecting and eliminating price differences. It shows each airline where it is underpricing its rivals and therefore leaving revenue on the table, and it shows each airline where a rival has cut a price so that the cut can be met quickly, which removes the reward for cutting price in the first place.

### G. DemandView Gives Every Subscriber the Same Forward-Looking Demand Signal

58. On October 5, 2026, 3Victors officially launched DemandView, which "draws on more than 1.4 billion daily search records" to show "where real traveler demand is building, before it appears in bookings," delivered "in a simple dashboard or data feed for use in an existing revenue management system." DemandView lets a user "[z]oom into one origin-destination pair to view the search volume and weekly trend for that specific route."

59. ATPCO's Chief Commercial Officer explained the point of the product at ATPCO's April 2026 conference: "Competitive intelligence tells you what rivals are doing, but it does not tell you what the market is about to do. That upstream signal is where the real advantage lives, and that is DemandView." He gave an example: when an airline's models suggest closing premium-cabin availability, but "the shopping data shows a premium cabin search spike more than 40% over the last six hours," the airline should "hold that inventory, adjust your bid price, and act before the moment passes."

60. When competing airlines on the same route receive the same demand signal from the same source, and each is told that the right response is to hold inventory and adjust its bid price, the predictable result is parallel reductions in discounted availability and parallel fare increases. On information and belief, DemandView supplies each subscribing airline with the same market-

wide search data, and with assurance that its rivals are seeing the same demand signal and have the same incentive not to discount.

61. The Airline Defendants do not merely receive these outputs; they build them into the systems that set fares. DemandView is delivered "in a simple dashboard or data feed for use in an existing revenue management system." 3Victors describes PriceEye as "allowing analysts to recommend pricing action." PriceEye's alerts are designed so that a pricing team is "pointed directly to what's changed and what it means in minutes." On information and belief, each Airline Defendant receives PriceEye or DemandView outputs, or both, through data feeds integrated into its revenue-management and pricing systems, and its pricing analysts are expected to review and act on impact-scored anomalies.

## DEFENDANTS' ANTICOMPETITIVE SCHEME

62. A cartel is a group of rival firms that replace independent pricing decisions with coordinated conduct designed to suppress competition among them. In a hub-and-spoke cartel, a common intermediary (the hub) facilitates the agreement among the competitor firms (the spokes). The competitors coordinate through the hub rather than communicating directly with one another. What connects them is their knowing participation in a common plan to restrain competition, with each acting on the understanding that its rivals are participating on the same terms.

63. The ATPCO Cartel dates back to no later than July 25, 2023, the date when ATPCO's eleven board airlines had approved the first step of ATPCO's collective shopping-data project, which was designed to raise and stabilize domestic airfares. To achieve that outcome, the Airline Defendants who were ATPCO members agreed, among themselves and with ATPCO and 3Victors, which administer the scheme, to: (1) contribute their competitively sensitive information ("CSI"), including non-public shopping data drawn directly from their own systems, to a common pool; (2) receive back from the hub, through PriceEye and DemandView, pricing and demand

signals built from their rivals' CSI; and (3) use those common signals to monitor, align, and stabilize fares and seat inventory. This joint delegation and exchange allows ATPCO to coordinate the airlines' pricing and maximize industry-wide fares.

64. Each Airline Defendant joined knowing the terms on which the exchange operated. American and Delta, through pricing and revenue-management executives on ATPCO's board, approved the first step of the collective shopping-data project in or before July 2023, as did Hawaiian, now part of Alaska, through its Chief Revenue Officer. Alaska, which had moved its fare management to ATPCO's Architect tool by May 2022, signed for PriceEye after a proof of concept no later than July 2024. JetBlue, an early investor in 3Victors, and American have been publicly identified as 3Victors customers since no later than June 2024. Southwest's pricing personnel presented PriceEye on ATPCO's stage no later than April 2026. The Airline Defendants did not need to join on the same day. Each joined knowing that its rivals had joined or were being invited to join on the same give-to-get terms.

### A. The Board Airlines Built the Exchange, and ATPCO Invited Other Airlines to Join

65. The airlines on ATPCO's board approved the first step of the shopping-data project in or before July 2023. In November 2023, ATPCO and United Airlines were scheduled to co-present a session at Amazon Web Services' re:Invent conference titled "Unlock Customer Value Securely with Clean Room Data Collaboration for Industries," featuring "speakers from ATPCO, an airline retail platform, and their customer, United Airlines, on how they are experimenting together." When it announced the acquisition of 3Victors weeks later, ATPCO again described the effort as enabling "ATPCO and participating airlines to analyze their collective shopping insights."

66. 3Victors pitches participation as a way for airlines to respond together to market conditions. "Airlines that participate in Iris help enable the real-time insight airlines need to

confidently monitor the competitive landscape and adjust pricing strategies as markets shift—hour by hour, not day by day." 3Victors reports that, at industry meetings, "[l]eaders emphasized the need for shared infrastructure and mutual benefit, validating our vision for Iris as a shared shopping data repository."

67. To attract new participants, and to keep existing ones, ATPCO and 3Victors advertise who is already in the cartel. Since at least June 2024, 3Victors' home page, which promises its "reimagined" travel data will "drive revenue growth," has displayed the logos of American and JetBlue among the "leading travel industry organizations" that "trust 3Victors." 3Victors announced Alaska's PriceEye contract by press release. ATPCO puts the pricing staff of airlines, like Southwest, on its stage, alongside ATPCO and 3Victors personnel, to discuss its shopping-data products. Such marketing contemplates and invites concerted action. An airline joins because it knows that its competitors are doing the same, and that only through coordination with them can it raise fares without losing passengers to a rival that undercuts.




*Figure 1 – 3Victors home page (www.3victors.com), "Leading travel industry organizations trust 3Victors" logo strip showing the American logo, captured October 30, 2026 (highlighting added)*




*Figure 2 – 3Victors home page (www.3victors.com), "Leading travel industry organizations trust 3Victors" logo strip showing the JetBlue logo, captured October 30, 2026*

### B. Why Airlines Accept ATPCO's Invitation

68. Participation is reciprocal. 3Victors states: "Participation in Iris is based on a simple principle: the more you contribute, the more you receive. PriceEye customers that share their shopping data gain access to enriched, competitive data at greater variety, velocity, and volume." "PriceEye customers that contribute shopping data to Iris receive time-relevant shopping data and, in return, gain access to the highest quality competitive dataset available."

69. 3Victors reported that in 2024 "[a]irlines content participation has increased by more than 5X this year with growing pipeline of airlines engaged in connecting with our network," and that in 2025 "another major global network carrier went live with PriceEye and Iris with many more entering trial periods."

70. Exchanging current, firm-specific shopping data with competitors is against each airline's independent self-interest. Absent an understanding that rivals will reciprocate, no airline would hand its competitors a window into its own offers and its customers' search behavior. The

give-to-get structure exists to secure that reciprocity: each airline's access to its rivals' data depends on its contributing its own.

### C. Each Airline Defendant's Participation

71. Each Airline Defendant participates in the exchange. Each files its fares through ATPCO. Each has sent pricing, revenue-management, or senior executives to ATPCO's industry conference. And each, on information and belief, contributes shopping data to Iris or to ATPCO's shopping-data projects and receives PriceEye outputs, DemandView outputs, or both. The facts specific to each are alleged below.

#### i. JetBlue

72. JetBlue was an investor in 3Victors before ATPCO bought it. JetBlue Technology Ventures, then "a wholly-owned subsidiary of JetBlue," reported that "[p]rior to COVID-19, we made two investments," the first of which was 3Victors. In January 2022, 3Victors and the airline-pricing company FLYR announced that they "both share JetBlue Technology Ventures as an investor." On information and belief, a JetBlue Technology Ventures principal served as a board observer of 3Victors. JetBlue's logo has appeared on 3Victors' home page among the organizations that "trust 3Victors" since at least June 2024. At ATPCO's April 2026 conference, in a session on shopping data, ATPCO's Chief Commercial Officer welcomed JetBlue's Senior Manager of Revenue Management Data Science and thanked him "for being our guinea pig on this data journey." On information and belief, JetBlue contributes shopping data to Iris and receives PriceEye outputs.

#### ii. Alaska and Hawaiian

73. In July 2024, 3Victors announced that Alaska "has partnered with the company for its PriceEye solution to supply competitive fare content to the carrier." Alaska's Director of Revenue Management stated: "After a successful proof of concept, we found that 3Victors'

PriceEye is a perfect fit for our competitive fare content needs," and "[t]he quality, completeness, and timely delivery of the data has been impressive to see." The release described Alaska as "a key user of ATPCO's other top products such as its pricing management tool Architect and its merchandising solution Routehappy." By May 2022, Alaska had signed a multi-year agreement to move its fare management to ATPCO's Architect pricing tool. Brent Overbeek, who sat on ATPCO's 2023 board as Chief Revenue Officer of Alaska's now-affiliate Hawaiian Airlines, served on ATPCO's board from 2014 to 2024; after leaving Hawaiian, he told ATPCO's 2026 conference, "I was a board member of ATPCO for 10 years." On information and belief, Alaska contributes shopping data to Iris and receives PriceEye outputs.

**iii. American**

74. American held a seat on ATPCO's board in 2023 through its Vice President of Revenue Management. American's logo has appeared on 3Victors' home page among the organizations that "trust 3Victors" since at least June 2024. American's Revenue Engineering leader, Marcial Lapp, was introduced at ATPCO's 2022 conference as one of the "valued members of the Dynamic Offers Design Team," and he spoke at ATPCO's conferences again in 2025 and 2026 as American's Vice President of Revenue Engineering, a group whose responsibilities include "yield management & pricing." ATPCO has named American as one of the airlines "already experimenting with dynamic offers on their owned direct channels." In January 2025, American's logo also appeared among the "Organizations represented" on ATPCO's Council page. On information and belief, American contributes shopping data to Iris and receives PriceEye outputs.

**iv. Delta**

75. Delta held a seat on ATPCO's board in 2023 through its Senior Vice President of International Pricing and Revenue Management. In January 2025, Delta's logo appeared among

the "Organizations represented" on ATPCO's Council page. ATPCO's Chief Commercial Officer, whose remit includes 3Victors, held leadership positions at Delta for fifteen years. At ATPCO's 2026 conference, held in Delta's hometown of Atlanta, Delta's Chief Operating Officer gave a keynote address, and Delta's Director of Pricing and Revenue Management Solutions said on a panel about dynamic offers: "I think it's fair to say we're definitely maximizing some of the capabilities of ATPCO." On information and belief, Delta contributes shopping data to Iris or ATPCO's shopping-data projects and receives competitive pricing and shopping data derived from them.

**v. Southwest**

76. Southwest files its fares through ATPCO: its fare-format guide for travel agents states that "[o]ur fares will continue to be filed via ATPCO." Southwest publicly reported its use of ATPCO's Routehappy product and, in 2020, expanded its direct connect through ATPCO's New Distribution Capability Exchange, and by August 2022 had signed multi-year agreements for ATPCO's Express Contracts and Routehappy products. At ATPCO's 2026 conference, Southwest's Senior Manager of Pricing Strategy appeared with a 3Victors data-science manager and an ATPCO director on a panel titled "Seeing the market clearly with PriceEye," which ATPCO described as covering "PriceEye, 3Victors' pricing intelligence solution built on Iris shopping data," which "helps airlines monitor market shifts and respond faster." On information and belief, Southwest subscribes to or uses PriceEye and contributes shopping data to Iris.




*Figure 3 – ATPCO Elevate 2026 session page (elevate.atpco.net), "Seeing the market clearly with PriceEye," listing a Southwest Airlines pricing manager among the speakers, captured Nov. 1, 2026*

**vi. Each Airline Defendant Knows Its Rivals Are Participating**

77. Each Airline Defendant knows that its competitors also participate in the shopping data-sharing arrangements facilitated by ATPCO and 3Victors, and that it is not the ATPCO Defendants' lone customer. Senior pricing and revenue-management executives of American, Delta, United, and Hawaiian, now Alaska's affiliate, sat together on the ATPCO board that approved the first step of the collective shopping-data project. 3Victors' "the more you contribute, the more you receive" mantra was announced to all of the Airline Defendants, and 3Victors' home page publicly identifies participating airlines as organizations that "trust 3Victors." And pricing and data staff of JetBlue, Southwest, and United have appeared with ATPCO or 3Victors personnel at ATPCO's conference in sessions on shopping data, PriceEye, and competitive intelligence. Each airline joined, and stays, with full knowledge that its competitors are also participating.

78. Each Airline Defendant also understood that the exchange works only if its rivals contribute too. Its access to its rivals' data depends on its rivals contributing theirs, and its own data is used to build the outputs its rivals receive. 3Victors told the market as much: at industry meetings, "[l]eaders emphasized the need for shared infrastructure and mutual benefit, validating our vision for Iris as a shared shopping data repository."

### D. The ATPCO Cartel's Scheme Pays Off

79. The information exchanged through ATPCO and 3Victors has the characteristics that make an exchange anticompetitive. It is current and forward-looking: PriceEye shows "observed fares for future departure dates," and DemandView shows demand "before it appears in bookings." The shared data is granular: it is broken out by route, channel, cabin, fare basis, and brand. It contains proprietary non-public data, specifically the shopping data sourced directly from airline systems. It is frequent; Iris is designed to let airlines adjust pricing "hour by hour, not day by day." And it is exchanged among firms that together dominate a concentrated market with inelastic demand.

80. The exchange of the shopping data reduces the incentives for airlines to compete. With PriceEye, according to ATPCO's Chief Commercial Officer, a rival's pricing team is "pointed directly to what's changed and what it means in minutes, not in days." The expected gain from cutting fares falls, and airlines offer fewer fare cuts to consumers. At the same time, each airline can raise fares with confidence that it will see promptly whether rivals follow, and can retreat quickly if they do not, which lowers the risk of leading a fare increase, another mechanism that keeps consumer domestic airfare prices high.

## DIRECT AND INDIRECT EVIDENCE OF THE ATPCO CARTEL

### A. Direct Evidence of the ATPCO Cartel

#### i. The Terms on Which Airlines Join

81. 3Victors publicizes the terms on which airlines join the exchange: "the more you contribute, the more you receive." On information and belief, each Airline Defendant that participates has entered into a subscription or data-contribution agreement with ATPCO and/or 3Victors. On information and belief, those agreements contemplate that the airline will (1) share its CSI through Iris or ATPCO's shopping-data projects; (2) receive competitive data built from its rivals' contributions; and (3) use PriceEye or DemandView outputs in setting fares and inventory. These agreements directly evidence the conspiracy.

#### ii. Statements by ATPCO and 3Victors

82. In June 2024, 3Victors described PriceEye as "allowing analysts to recommend pricing action, construct narratives and prepare performance reports with a more complete view of the market," and its co-founder stated that "[p]roviding successful airline pricing strategies depends on access to accurate and comprehensive real-time information of the sort that we will continue to mine and share." At ATPCO's April 2026 conference, an industry analyst asked ATPCO's new chief executive whether ATPCO could keep itself "clean and tidy and well delineated so we don't get into any of the potential issues that we saw with some airlines and some vendors recently being asked to explain themselves to Congress." The chief executive answered that ATPCO "can absolutely stay clean of that," and that ATPCO would continue to "provide the inputs that an airline needs to enable dynamic retailing" through its acquisition of 3Victors. ATPCO does not need to recommend a price to coordinate prices; it supplies each airline with the same pooled inputs.

83. ATPCO's leadership knows how airlines use the data. Its Chief Commercial Officer told the 2026 conference that, with 3Victors' tools, "competitive shifts surface automatically," that the airline is "pointed directly to what's changed and what it means in minutes, not in days," and that "[e]very hour of lag is an hour of missed opportunity. PriceEye eliminates that lag." In the same session he observed: "we talked to a lot of airlines where competitive data becomes a crutch for them. Everyone's watching each other. Sometimes some are leading, some are reacting." He then asked his JetBlue guest how airlines could use the data "to differentiate and not just follow[]."

**iii. Communications Between the Hub and the Spokes**

84. ATPCO's board, made up largely of airline pricing and revenue-management executives, approves ATPCO's strategic roadmap and approved the first step of the shopping-data project. On information and belief, at board, council, and design-team meetings, ATPCO and 3Victors personnel tell participating airlines which carriers are contributing shopping data and how participants are using PriceEye and DemandView.

85. ATPCO also provides the Airline Defendants with regular opportunities to meet. ATPCO's annual Elevate conference brings pricing and revenue-management personnel of competing airlines together with ATPCO and 3Victors staff. Its 2026 conference, held in Atlanta from April 20 to 22, 2026, featured pricing, revenue-management, or senior executives from American, Delta, JetBlue, and Southwest, among others, and its on-demand content is tagged "3V / Competitive Intelligence." As Delta's Chief Operating Officer told the conference, in this industry "[y]ou could be a customer, you could be a partner, you could be a supplier, or you could be a competitor, all in the same meeting." ATPCO also convenes councils and design teams, including a Dynamic Offers Design Team in which, according to ATPCO's 2026 press kit, "60+ airlines" are "currently participating."

### B. Indirect Evidence of the ATPCO Cartel

#### i. The Airline Defendants Act Against Their Individual Economic Interest

86. As part of the ATPCO Cartel, each Airline Defendant engages in conduct that would be against its own economic self-interest if it acted alone, but that maximizes collective profits within the scheme. These actions against self-interest are strong circumstantial evidence of a horizontal agreement.

87. These are not the price moves that any airline might make on its own in an interdependent market, such as raising a fare in the hope that rivals will follow. Each depends on an airline surrendering its own non-public information to its rivals, which no airline would do unilaterally.

88. First, no airline acting alone would give its competitors a window into its own offers and its customers' search behavior. Rivals could use that window to undercut it and take its passengers. An airline contributes its shopping data only because it knows its rivals have agreed to do the same.

89. Second, an airline acting alone would protect, not disclose, the dynamically generated, channel-specific offers it makes to travelers, so that it could cut fares selectively without immediate detection. Inside the cartel, PriceEye points rivals to the cut "in minutes, not in days," so the cut wins little, and the incentive to cut disappears.

90. Third, an airline acting alone sets its seat inventory and bid prices from its own forecasts. Inside the cartel, ATPCO tells airlines that when DemandView's shopping data shows search demand building, even if their own models say otherwise, they should "hold that inventory, adjust your bid price, and act before the moment passes." Withholding lower-priced seats and

raising bid prices on a common signal is profitable only if rivals, seeing the same signal, do the same.

**ii. Parallel Conduct**

91. The airline industry has a long history of fare coordination. In addition to the 1992 ATPCO case described above, the DOJ alleged in 2023 that airlines "follow the leader" on fare increases, and described how a JetBlue fare increase in May 2020 was matched by United, Delta, and American, and how an April 2022 Delta increase was followed by JetBlue, Southwest, and American.

92. Participation in 3Victors' network has grown: 3Victors reported a more than fivefold increase in airline content participation in 2024, and another major global network carrier went live with PriceEye and Iris in 2025.

93. The Airline Defendants' parallel conduct is, first, their parallel adoption of the exchange. After ATPCO's board approved the collective shopping-data project in July 2023 and ATPCO acquired 3Victors in December 2023, each Airline Defendant connected to ATPCO's shopping-data products, as alleged above. Each departed from the way airlines had historically learned about competitors' prices, which was by observing published fares, and began exchanging non-public shopping data through a common hub.

94. The shift was complex and historically unprecedented. For decades, airlines exchanged only filed fares through ATPCO. Moving to a common repository of non-public shopping data required collective approval by ATPCO's board of airline pricing executives, common data standards ("a single standardized stream of flight shopping data"), direct API connections into each airline's systems, a cloud "clean room" for collective analysis, and contracts conditioning each airline's access on its contribution. These were decisions about what

competitively sensitive information rivals would share with one another, not merely the mechanics of implementing pricing decisions each airline had made on its own.

**iii. The Market for Domestic Air Travel Is Susceptible to Cartelization**

95. First, barriers to entry are high. New entrants need aircraft, crews, airport gates, and, at congested airports, takeoff and landing slots, which incumbents control.

96. Second, demand for air travel is relatively inelastic, especially for business travelers and for travelers with fixed dates, such as those attending funerals, weddings, and medical appointments. A coordinated increase in fares therefore reduces sales by less than it increases revenue.

97. Third, the market is highly concentrated, as alleged above. Many individual routes are served by only two or three Airline Defendants.

98. Fourth, the product is largely standardized, and the Airline Defendants watch and match one another's prices. A seat on a nonstop flight between two cities at a given time is a commodity-like product, and fares are the principal dimension of competition. Prices are posted, change constantly, and can be monitored in near real time, which makes deviations from a coordinated price easy to detect and punish.

99. Fifth, the Airline Defendants share CSI with one another, using ATPCO, Iris, PriceEye, and DemandView as a conduit. As alleged above, this would be against their independent self-interest absent an agreement.

100. Sixth, Defendants have ample opportunities to collude in addition to the collusion that occurs as a result of sharing CSI about consumer demand. Defendants meet at ATPCO board meetings, in ATPCO's councils and design teams, and at ATPCO's annual Elevate conference, where pricing staff of competing airlines meet with ATPCO and 3Victors personnel.

101. Seventh, the industry has a documented history of using the same system to coordinate fares, as alleged by the DOJ in 1992, 2004, and 2023.

## THE RELEVANT MARKET

102. This case concerns a horizontal price-fixing arrangement, which is *per se* unlawful, and Plaintiffs need not define a market to establish it. Plaintiffs nonetheless allege a relevant market below. The purpose of the data-sharing agreement that ATPCO and 3Victors administer is to coordinate horizontal competitors, the Airline Defendants, to raise and stabilize fares.

103. To the extent a market definition is needed, the relevant product market is scheduled passenger air transportation. The relevant geographic markets are the United States as a whole and each origin-and-destination city pair served by two or more Airline Defendants. For a passenger who needs to fly between two cities, there is no reasonable substitute for scheduled air service, and a small but significant price increase by a hypothetical monopolist of air travel on a route would be profitable.

104. The United States is a relevant geographic market. The Airline Defendants set and file fares through national pricing and revenue-management systems, ATPCO distributes their fares nationally, and PriceEye and DemandView supply competitive and demand data across the Airline Defendants' national networks.

105. Practical indicia confirm the market. Industry participants, the DOJ, and the Department of Transportation treat scheduled passenger air service as a distinct market and measure it by city pair. Airfares are set, filed, and distributed through their own pricing system, ATPCO, separate from other modes of travel.

## DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET

106. If the rule of reason applies, Plaintiffs can prove market power in two ways. The direct proof is the Airline Defendants' demonstrated ability, acting through the exchange, to hold

fares above competitive levels, as alleged above. The indirect proof is their combined share of a concentrated market. According to the DOJ, American, Delta, Southwest, and United Airlines, which is not presently a Defendant but, on information and belief, is an unnamed co-conspirator, "control approximately 80% of flights nationwide." Travelers have no real alternative to buying from a member of the cartel. Measured by the Bureau of Transportation Statistics' figures alleged above, the five Airline Defendants alone carried approximately 64.4% of domestic revenue passenger miles in the twelve months ending July 2026, and approximately 81.6% together with United, a co-conspirator not named as a defendant.

## ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY

107. Defendants' conduct had the following effects, among others: (a) price competition among the Airline Defendants for domestic air travel was restrained, suppressed, and eliminated; (b) fares were raised, fixed, maintained, and stabilized at artificially high levels; and (c) purchasers of domestic air travel were deprived of free and open competition.

108. Plaintiffs and the members of the Class purchased tickets from the Airline Defendants and paid more for them than they would have paid in a competitive market. That overcharge is injury of the type the antitrust laws were intended to prevent and flows from that which makes Defendants' conduct unlawful.

109. No procompetitive justification requires the exchange of current, non-public, firm-specific pricing and shopping data among competitors, and any legitimate benefit could be achieved through less restrictive means, such as historical data old enough that it does not reveal any rival's current or planned offers or the demand it is seeing.

110. While the conspiracy continues, Plaintiffs and the Class will continue to pay inflated fares.

## CLASS ACTION ALLEGATIONS

111. Plaintiffs bring this action on their own behalf and as representatives of a class under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The class (the "Class") is defined as follows:

> All persons and entities in the United States that purchased from one or more Airline Defendants, directly or through an agent acting on an Airline Defendant's behalf, a ticket for scheduled passenger air transportation between two points in the United States, during the period from November 1, 2022 until the effects of Defendants' conduct cease (the "Class Period").

112. Excluded from the Class are Defendants; their parents, subsidiaries, affiliates, officers, and directors; the co-conspirators identified in this Complaint; federal, state, and local government entities; and the judge assigned to this action, the judge's staff, and the members of the judge's immediate family.

113. The Class is so numerous that joinder of all members is impracticable. The Airline Defendants sell many millions of domestic tickets each year, and Class members can be identified from Defendants' ticketing and reservation records.

114. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and every Class member bought domestic air travel from the Airline Defendants, rely on the same legal theories, and seek to redress the same injury: fares inflated by the same conduct.

115. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are not antagonistic to those of the Class, and Plaintiffs have retained counsel experienced in antitrust and class action litigation.

116. Questions of law and fact common to the Class predominate over any questions affecting only individual members, because Defendants acted, and refused to act, on grounds generally applicable to the Class. Those common questions include:

a. Whether Defendants agreed to exchange competitively sensitive pricing and shopping data through ATPCO and 3Victors;

b. Whether Defendants and their co-conspirators conspired to fix, raise, maintain, or stabilize fares for domestic air travel;

c. The duration and scope of the conspiracy;

d. Whether Defendants' conduct is unlawful *per se*, under a quick-look analysis, or under the rule of reason;

e. Whether Defendants' conduct caused fares for domestic air travel to be higher than they would have been absent the conduct;

f. The proper measure of class-wide damages; and

g. Whether Plaintiffs and the Class are entitled to injunctive relief.

117. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Each Class member's overcharge is small compared with the cost of antitrust litigation against Defendants, so individual suits are impracticable, and separate actions would risk inconsistent rulings on the same conduct.

118. Defendants have acted on grounds generally applicable to the Class, so final injunctive relief is appropriate for the Class as a whole under Rule 23(b)(2).

## CAUSES OF ACTION

### COUNT ONE

### Hub-and-Spoke Conspiracy to Fix, Raise, and Stabilize Airfares in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (On Behalf of Plaintiffs and the Class Against All Defendants)

119. Plaintiffs repeat and reallege every preceding allegation as if fully set forth in this Count.

120. Plaintiffs seek damages and injunctive relief on behalf of themselves and the Class under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for Defendants' violation of Section 1 of the Sherman Act.

121. Beginning at a time unknown to Plaintiffs but no later than July 25, 2023, and continuing through the present, Defendants and their co-conspirators entered into and carried out a continuing contract, combination, or conspiracy to fix, raise, maintain, and stabilize the price of domestic air travel, in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

122. Under the conspiracy, the Airline Defendants agreed with each other and with the ATPCO Defendants to pool their competitively sensitive data through ATPCO and 3Victors and to use the resulting common pricing and demand signals to align their fares and inventory decisions. The ATPCO Defendants organized and administered the conspiracy, including through the give-to-get terms of Iris.

123. The ATPCO Defendants knowingly joined and furthered the conspiracy. They did not merely sell a product. ATPCO's board of airline pricing executives approved the shopping-data project, ATPCO supplies its own fare data as an input to PriceEye, and ATPCO and 3Victors profit from each additional airline that contributes data, because each contribution increases the value of the pooled outputs they sell to every participant.

124. Defendants' conduct in furtherance of the conspiracy was authorized, ordered, or done by their officers, directors, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

125. Defendants committed acts in furtherance of the conspiracy, including the following:

- ATPCO's board airlines, including American, Delta, and United, approved the first step of ATPCO's collective shopping-data project;
- ATPCO acquired 3Victors and offered Iris, PriceEye, and DemandView to airlines on the strength of airline-contributed data;
- ATPCO and 3Victors marketed participation to competing airlines on published give-to-get terms and publicized which airlines were participating;
- on information and belief, the Airline Defendants contributed current, non-public, competitively sensitive shopping data to Iris or ATPCO's shopping-data projects;
- on information and belief, the Airline Defendants knowingly used PriceEye and DemandView outputs that incorporate their rivals' competitively sensitive information, and set fares and seat inventory using those common signals; and
- Defendants' pricing and revenue-management personnel met at ATPCO board meetings, councils, design teams, and conferences.

126. The conspiracy is a *per se* violation of Section 1 of the Sherman Act. In the alternative, it is unlawful under a quick-look analysis, because its tendency to raise fares is obvious, and under the rule of reason, because its anticompetitive effects are substantial and are not outweighed by any procompetitive justification. Any proffered justification, to the extent legitimate, could be achieved through less restrictive means. Examples include pricing tools that use only an airline's own data, or historical, aggregated data that does not reveal any rival's current or planned offers or the demand it is seeing.

127. Each Defendant is jointly and severally liable for the full overcharge caused by the conspiracy.

128. As a direct and proximate result of the conspiracy, Plaintiffs and the Class paid supracompetitive fares and have been injured in their business or property. They are entitled to treble damages, costs, and reasonable attorneys' fees under Section 4 of the Clayton Act, 15 U.S.C. § 15, and to a permanent injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, ending the unlawful conduct.

## COUNT TWO

### Unlawful Exchange of Competitively Sensitive Information in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (On Behalf of Plaintiffs and the Class Against All Defendants)

129. Plaintiffs repeat and reallege every preceding allegation as if fully set forth in this Count.

130. Defendants entered into a contract, combination, or conspiracy to exchange current, forward-looking, granular, non-public pricing and shopping data among competing airlines through ATPCO, Iris, PriceEye, and DemandView.

131. The information exchanged was current, granular, and non-public. It included transaction-level sales, prices, and demand information. The exchange took place in a concentrated market with inelastic demand, standardized products, and high barriers to entry, and it had the purpose and effect of reducing price competition and increasing fares for domestic air travel. It is an unreasonable restraint of trade under the rule of reason. Any procompetitive benefits are outweighed by its anticompetitive effects and could be achieved by less restrictive means.

132. As a direct and proximate result, Plaintiffs and the Class paid supracompetitive fares and have been injured in their business or property. They are entitled to treble damages, costs, and reasonable attorneys' fees under Section 4 of the Clayton Act, 15 U.S.C. § 15, and to an injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, against continuation of the exchange.

## PETITION FOR RELIEF

133. Plaintiffs, on behalf of themselves and the Class, petition for the following relief:

a. A determination that this action may be maintained as a class action under Federal Rule of Civil Procedure 23, that Plaintiffs be appointed Class representatives, and that Plaintiffs' counsel be appointed Class counsel;

b. A determination that Defendants' conduct is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, under a *per se*, quick-look, or rule-of-reason analysis;

c. An award of damages to Plaintiffs and the Class in an amount to be determined at trial, trebled under 15 U.S.C. § 15, for which Defendants are jointly and severally liable;

d. A permanent injunction under 15 U.S.C. § 26 barring Defendants from exchanging current or forward-looking, non-public pricing, inventory, or shopping data among competing airlines, whether through ATPCO, 3Victors, Iris, PriceEye, DemandView, or any other means, and from any other contract, combination, or conspiracy having a similar purpose or effect;

e. An award of pre- and post-judgment interest on all amounts awarded;

f. An award of attorneys' fees and costs; and

g. Such other relief as the Court deems just and equitable.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Dated: November 3, 2026

Respectfully submitted,

**LEVI & KORSINSKY LLP**

By: /s/ Elizabeth K. Tripodi
Elizabeth K. Tripodi (VSB #73483)
1101 Vermont Ave. NW, Suite 800
Washington, D.C. 20005
Telephone: (202) 524-4290
Facsimile: (202) 333-2121
Email: etripodi@zlk.com

Eduard Korsinsky*
Ellen T. Noteware*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: ek@zlk.com
Email: enoteware@zlk.com

*Counsel for Plaintiffs and the Proposed Class*

**pro hac vice* forthcoming